## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

**SHARON DENISE FAULK-FOSTER**
**3605 Moses Way, No. 301**
**Waldorf, Charles County, Maryland  20602;**

**and**

**VINCENT LAMONT MILLER**
**6225 Springhill Court, No. 105**
**Greenbelt, Prince George's County, Maryland  20770;**

*Plaintiffs*,

*v.*

**JULIA M. DYER (in her individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**MICHAEL G. JOSEPH (in his individual capacity),**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**MICHAEL G. GIACALONE, Jr. (in his individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**MICHAEL J. GRUBER (in his individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**JOHN E. WAGNER (in his individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheateon, Montgomery County, Maryland  20902;**

**CIVIL NO.**

**COMPLAINT**
**AND**
**JURY DEMAND**

**MICHAEL W. PAUL (in his individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**PAUL R. REESE (in his individual capacity)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**JOHN AND JANE DOE DEFENDANT OFFICERS (in their individual capacities)**
**Montgomery County Police Department**
**2300 Randolph Road**
**Wheaton, Montgomery County, Maryland  20902;**

**and**

**MONTGOMERY COUNTY, MARYLAND**
**101 Monroe Street**
**Rockville, Montgomery County, Maryland  20850;**

*Defendants.*

### INTRODUCTION

This case involves a textbook example of racial profiling by Montgomery County Police Department ("MCPD") officers who stopped an African-American family in the process of moving a grandmother into her new apartment on the pretext of a never clearly identified windshield obstruction.  Without any reason to suspect wrongdoing, officers prolonged this stop for a minor traffic infraction into an hour-long ordeal and public spectacle on a busy road in which officers used tricks and pressure to get the driver to consent to a search, handcuffed him and his child's grandmother for no reason, and subjected them to humiliating pat-down, canine, and other intrusive searches.  There were many opportunities for officers on the scene, including supervisors, to end the stop.  Instead, each time they found nothing, the officers escalated their

Fourth Amendment violations further, in the apparent hope that they would stumble across evidence of some crime. This approach to policing is exactly what the Fourth Amendment forbids.

Moreover, this humiliating, prolonged detention of a Black family innocent of any wrongdoing reflects a pattern and practice by MCPD of initiating and/or prolonging traffic stops of Black and brown motorists through fishing expeditions for evidence of a crime without reasonable suspicion or probable cause, and by instructing junior officers to adopt this approach. Put simply, every aspect of this stop illustrates that MCPD officers are taught to treat stops and searches of people innocent of any wrongdoing as costless and routine—as "proactive policing." But, in reality, these pretextual stops and baseless searches are humiliating, terrifying, and violations of constitutional rights. And by focusing these practices on people of color, MCPD sends the message that people of color are second-class citizens.

Here, Vincent Miller was driving in Montgomery County, and Sharon Faulk-Foster was a passenger in Mr. Miller's car. Ms. Faulk-Foster's daughter, Lekeisha Brown, and Ms. Brown's two-year-old son were in front of them with a U-Haul truck full of Ms. Faulk-Foster's belongings.

Just a few minutes after they stopped Mr. Miller's car, MCPD officers confirmed that Mr. Miller's license and registration were valid and that he was not wanted by any police department. Rather than send Mr. Miller and Ms. Faulk-Foster on their way, MCPD officers subjected them to an hour-long, humiliating, and unconstitutional nightmare.

The officers' statements and actions throughout the duration of the stop demonstrate that their intent from the outset was to search Mr. Miller's car. To achieve their goal, the officers detained Mr. Miller and Ms. Faulk-Foster until a K9 officer arrived with his dog. The K9 dog

3

sniffed around Mr. Miller's car and, despite the driver-side window and the passenger-side door being open, showed no interest in its interior.  The K9 officer claimed, however, that the dog showed interest in the outside of the passenger-side door handle.  Based on this flimsiest of pretexts and with no grounds to believe that Mr. Miller or Ms. Faulk-Foster had any illegal drugs on them or in the car, the officers arrested them by placing them in handcuffs.  The officers conducted embarrassing and intrusive pat-down searches of Mr. Miller and Ms. Faulk-Foster's bodies, Ms. Faulk-Foster's purse, and Mr. Miller's car, and found nothing.  Only then, after egregiously violating their constitutional rights, did MCPD officers release Mr. Miller and Ms. Faulk-Foster from handcuffs.  Officers did not issue Mr. Miller a ticket for any traffic infractions, instead they simply issued two repair orders and a warning for a purported windshield obstruction.

The officers' conduct was captured on the body cameras that some of them wore.  The body camera videos show a superior officer training a junior officer to use methods that she characterized as "ridiculous" to try to induce Mr. Miller to consent to the search of his car.  They show the supervising officer asking a third officer who had just arrived to "un-fuck up" the situation when she realized her efforts had failed.  The videos show officers scheming to come up with some reason to justify searches of the car.

The officers' actions and their statements demonstrate that the officers never believed that they had legitimate grounds to detain and search Mr. Miller and Ms. Faulk-Foster.  If there were any doubt that Mr. Miller and Ms. Faulk-Foster were subjected to the violation of their rights as a result of their race as African-Americans, a second supervising officer made repeated racist comments at several different points during the stop, comments which nearby officers found humorous.  Those racist comments were caught on video during the incident.

4

None of this was inadvertent, but instead was part of established MCPD practices. These practices are not only shocking, but designed to violate the constitutional rights of motorists, particularly motorists of color. MCPD's own published data concerning the traffic citations, warnings, equipment repair orders, and similar notices that its officers issue that flow from traffic stops (hereafter "Traffic Notices") reveal troubling disparities based on race and ethnicity. Published data also shows that MCPD officers have a pattern and practice of searching African-American motorists at significantly higher rates than White motorists. Mr. Miller's own experiences and the experiences of others show that the MCPD has a practice of detaining motorists of color for unduly prolonged periods, including by subjecting them to false arrests, during which motorists are made to wait for K9 units to arrive or watch as their cars are searched based on dubious claims by officers.

The videos capture the degredation and humiliation Mr. Miller and Ms. Faulk-Foster experienced, made all the more acute as it was in full view of the public and in front of their children and grandchild. While polite toward the officers throughout the ordeal, both Mr. Miller and Ms. Faulk-Foster became upset when officers placed them in handcuffs; the videos show Ms. Faulk-Foster quietly crying while her hands were cuffed behind her back. Her relief at being released was so palpable that, remarkably, she hugged the female officer in charge when the officer removed the handcuffs. Nevertheless, the officers' behavior caused great distress for Mr. Miller and Ms. Faulk-Foster and made them distrustful of police.

The MCPD officers' egregious misconduct, described in detail below, violated Mr. Miller's and Ms. Faulk Foster's rights under the Fourth and Fourteenth Amendments to the United States Constitution and Articles 24 and 26 of the Maryland Declaration of Rights. The MCPD officers' illegal behavior included impermissibly prolonging a traffic stop whose

legitimacy was dubious from the start.  It involved forcibly detaining Mr. Miller and Ms. Faulk-Foster while awaiting the arrival of the canine unit.  Their misconduct included coercing Mr. Miller to consent to the search of his trunk against his will.  MCPD officers' illegal behavior further involved arresting Mr. Miller and Ms. Faulk-Foster without probable cause, and then separate illegal searches of their bodies and their property, also without probable cause.  The officers also falsely arrested and committed assaults and batteries upon them in violation of Maryland law.

## NATURE OF ACTION

1.      This action arises under, *inter alia*, the Constitution of the United States of America ("Constitution") and 42 U.S.C § 1983 ("1983"), as well as pursuant to the constitution and the laws of Maryland.

2.      As alleged in greater detail below, officers of the Montgomery County Police Department ("Defendant Officers") deprived Plaintiffs of their rights, guaranteed under the Fourth and Fourteenth Amendments to the Constitution and the constitution and the laws of the State of Maryland, against unreasonable searches and seizures, unlawful detention, and false arrest, and also engaged in discriminatory conduct based on the Plaintiffs' race.

3.      In addition, the Defendant Officers' supervisors and their employer, Montgomery County, Maryland, established and/or condoned policies, practices, or procedures and failed to properly train and supervise Defendant Officers, resulting in the deprivation of Plaintiffs' constitutional rights.

4.      The Defendant Officers, under color of law, stopped the car in which the Plaintiffs were riding based on the Plaintiffs' race, and then unlawfully extended the traffic stop

beyond its Constitutional limits and detained, arrested, and searched the personal property of

Plaintiffs and their persons without the requisite reasonable suspicion and/or probable cause.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 1331

over the claims arising out of violations of the United States Constitution.  Supplemental

jurisdiction over Plaintiffs' pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in the United States District Court for the District of Maryland

under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the

claims herein occurred in this judicial district.

## PARTIES

7.      Plaintiff Sharon Denise Faulk-Foster is an African-American resident of Waldorf,

Charles County, Maryland.

8.      Plaintiff Vincent Lamont Miller is an African-American resident of Greenbelt,

Prince George's County, Maryland.

9.      Defendant Julia M. Dyer (Badge No. 2714) was at all times relevant to this

Complaint an MCPD officer, acting under color of state law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of Montgomery County, Maryland.  She is sued here in

her individual capacity.  She was one of the lead officers in the unlawful detention, search, and

arrest of the Plaintiffs.

10.     Defendant Michael G. Joseph (Badge No. 2846) was at all times relevant to this

Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is

sued here in his individual capacity.

11.     Defendant John E. Wagner (Badge No. 2732) was at all times relevant to this Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is sued here in his individual capacity.

12.     Defendant Michael G. Giacalone, Jr. (Badge No. 2669) was at all times relevant to this Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is sued here in his individual capacity.

13.     Defendant Michael J. Gruber (Badge No. 2570) was at all times relevant to this Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is sued here in his individual capacity.

14.     Defendant Michael W. Paul (Badge No. 1294) was at all times relevant to this Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is sued here in his individual capacity.

15.     Defendant Paul R. Reese (Badge No. 1543) was at all times relevant to this Complaint an officer with the MCPD, acting under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland.  He is sued here in his individual capacity.  Defendant Officer Reese was an MCPD supervisor responsible for the actions of the other Defendant officers.

16.     John and Jane Doe Defendant Officers are officers and/or supervisors with names yet unknown who were appointed and acting officers and/or supervisors of the MCPD during

times relevant to this Complaint; acted under color of state law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Montgomery County, Maryland; and violated Plaintiffs' constitutional rights in connection with Plaintiffs' arrests.

17.     Defendant Montgomery County, Maryland is an independent county located in the State of Maryland and at all times relevant to this Complaint employed Defendants Officer Dyer, Officer Joseph, Officer Wagner, Officer Giacalone, Officer Gruber, Officer Paul, Officer Reese, and John and Jane Doe Defendant Officers.  Montgomery County, Maryland is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the MCPD.

18.     At all times relevant herein, the parties were present in the State of Maryland and Defendant Officers acted under color of Maryland law and, in whole or in part, in their capacities as agents and employees of the MCPD.

**FACTS**

**A.  The Stop:**

19.     On May 2, 2016, Mr. Miller was driving his White 1997 Ford Crown Victoria and Ms. Faulk-Foster was a passenger in the car.  Ms. Faulk-Foster's daughter, Lekeisha Brown (who is Mr. Miller's son's mother), was in front of Mr. Miller, driving in a rental moving truck with the toddler.

20.     Mr. Miller, Ms. Faulk-Foster, and Ms. Brown were in the process of moving Ms. Faulk-Foster's household belongings (in the rental truck and in Mr. Miller's car) from her then-home in Olney, Maryland to her new home in Waldorf, Maryland.

21.     Mr. Miller was following the posted speed limit and all other moving traffic laws. At roughly 1:55 pm, Office Julia Dyer (Badge No. 2714) of the MCPD began driving along the passenger side of Mr. Miller's car as he drove south on Georgia Avenue.  As she did so, Officer

Dyer looked at Ms. Faulk-Foster through the passenger window.  Officer Dyer could see that the

occupants of the car were African-American.

22.     Officer Dyer followed Mr. Miller's car for up to a mile.  Officer Dyer activated

her body camera, which began recording continuously until the incident was over.

23.     Near the intersection of Georgia Avenue and Randolph Road in Montgomery

County, Maryland, Officer Dyer activated her cruiser lights and pulled Mr. Miller's car over.

24.     Ms. Brown observed Mr. Miller being stopped by an MCPD officer and stopped

the truck she was driving nearby.

25.     Officer Dyer approached the car and told Mr. Miller that she stopped him because

of a windshield obstruction, although she did not explain the nature of that obstruction.  Officer

Dyer asked Mr. Miller for his license, vehicle registration, and insurance information.  Mr.

Miller immediately gave Officer Dyer his license and registration.  While looking for his

insurance card, Mr. Miller told Officer Dyer that if he could not find the physical insurance card,

he had an electronic version on his phone.

26.     Shortly after Officer Dyer stopped Mr. Miller's car, at approximately the same

time that Officer Dyer began speaking to Mr. Miller, Officer Michael Joseph (Badge No. 2846)

arrived at the scene in his own patrol car.  A third, unidentified African-American officer also

appeared at the scene.  Upon information and belief, Officer Joseph was a relatively

inexperienced police officer and Officer Dyer was either formally or informally training him.

27.     Officer Dyer returned to her car with Mr. Miller's license and registration and

began to type information from his documents into her computer in order to run searches on his

name and his vehicle through law enforcement databases.  While still in his car, Mr. Miller,

concerned that he had not been able to produce the paper verification of insurance and eager to

end the traffic stop so that they could continue on their way to move Ms. Faulk-Foster into her

new home, asked one of the other officers to take his smart phone to Officer Dyer as she sat in

her cruiser because it contained the electronic version of his insurance coverage verification.

The officer brought the phone to Officer Dyer.

28.     At this point, unbeknownst to the Plaintiffs, and before obtaining results on her

queries to law enforcement databases, Officer Dyer demonstrated her determination to search

Mr. Miller's car despite lacking any reasonable suspicion of any crime.

29.     As Officer Joseph leaned into the passenger side window of her cruiser where she

was seated, Officer Dyer asked him, "Do you know how to get into the car?"  When Officer

Joseph hesitated, Officer Dyer gave Officer Joseph step-by-step instructions on how he should

attempt to convince Mr. Miller to consent to the search of Mr. Miller's car.

30.     Upon information and belief, Officer Dyer described to Officer Joseph methods

that she had learned in training from supervisors or other officers who had trained her as part of

policies and procedures or training by the MCPD.

31.     Officer Dyer instructed Officer Joseph to ask Mr. Miller a series of questions to

determine whether Mr. Miller had ever been stopped by the police, which she described as

"kinda standard" questions.  She said Officer Joseph should ask Mr. Miller if he had ever been

stopped by the police, and "then get into specifics, traffic, civil, criminal, ever been locked up

before."  Officer Dyer said that if the answer to all of those questions are "no," then Officer

Joseph should ask Mr. Miller if he "ever had any police contact before, ever been part of a

report."

32.     Officer Dyer told Officer Joseph that she put "him," referring to Mr. Miller, in

"LInX" before she pulled his car over, an apparent reference to the Law Enforcement

Information Exchange.  Officer Dyer claimed she "got 64 hits [on LinX], so, at least one of those answers should be yes."

33.     Whether or not the "64 hits" pertained to Mr. Miller or someone else with the same or a similar name, the number of "hits" did not provide reasonable articulable suspicion for the officers to detain Mr. Miller and Ms. Faulk-Foster, nor to search the car, and Officer Dyer did not suggest it did to Officer Joseph.   Mr. Miller has no criminal convictions.

34.     Officer Dyer instructed Officer Joseph to ask if Mr. Miller had "anything illegal in the car: guns, drugs, bazooka, dead body in the trunk."  She explained that the question: "sounds ridiculous, most people hit dead body and [they respond] 'nah' [and you then ask] 'can I get consent.'"  Officer Dyer concluded her tutorial on how to pressure Mr. Miller to consent to a search of his car by telling Officer Joseph, "there you go, work it out."

35.     At this point, Officer Dyer received the result of the National Crime Information Center ("NCIC") search she had initiated.  The result completely cleared Mr. Miller and his car, meaning that neither Mr. Miller nor his car (based on its license plate and vehicle identification number) were wanted by any law enforcement agency anywhere in the nation that had reported such information to NCIC.  She also learned that Mr. Miller's license status was "valid" and he had no points on his license.

36.     Less than five minutes after activating her body camera, Mr. Miller had satisfactorily demonstrated and Officer Dyer had confirmed through her computer that his license and registration were valid, that no law enforcement agency had any detainer or warrant against him, and that his car was not sought in connection with any crime.

37.     Officer Dyer had no reason to further detain Mr. Miller and Ms. Faulk-Foster, and she was required under the law to allow Mr. Miller to proceed on his way.  If Officer Dyer

believed that Mr. Miller's "windshield obstruction" merited a citation, warning, or Safety
Equipment Repairs Order ("SERO", also referred to by Defendant Officers as an "ERO" and
herein as "Repair Orders"), she should have immediately issued one of those documents, ended
her detention of the Plaintiffs, and allowed them to go.  But Officer Dyer, who still had
possession of Mr. Miller's license, registration, and smart phone, did not choose either of those
options.  Instead, she unlawfully detained Mr. Miller and Ms. Faulk-Foster to engage in a
humiliating fishing expedition for evidence of some unknown crime.

38.     Officer Dyer retained possession of Mr. Miller's licence, registration, and smart
phone for the entire duration of the stop, and did not return them to him until he was released
from handcuffs.

**B.  The Unlawful Detentions:**

39.     After receiving direction from Officer Dyer on how to find a way to search the
car, Officer Joseph approached Mr. Miller, who was still seated in his car.  Officer Joseph asked
Mr. Miller if he would mind getting out of the car to talk "for a second."  Mr. Miller acquiesced.

40.     As Officer Joseph and Mr. Miller walked toward the back of Mr. Miller's car,
Officer Joseph questioned Mr. Miller, following, nearly verbatim, the script mapped out by
Officer Dyer.  Officer Joseph began a casual conversation with Mr. Miller.  Mr. Miller, thinking
that this was about the windshield, explained that he had already talked with someone who had
agreed to repair his windshield.

41.     Officer Joseph began asking the types of questions suggested by Officer Dyer.
Officer Joseph asked Mr. Miller if he had ever been arrested or had other contacts with the
police.  Mr. Miller replied that he had been pulled over for speeding.  He also said that he had

once been arrested in Virginia a long time before, but soon clarified that he had never been "locked up."

42.     Officer Joseph then asked the "ridiculous" questions suggested by Officer Dyer, asking Mr. Miller if he had anything in his car, "drugs, guns, dead bodies."  Just as Officer Dyer predicted, Mr. Miller reacted strongly to the "ridiculous" questions, physically backing away from Joseph and exclaiming "Whoa, really! Whoa!"

43.     Mr. Miller told Officer Joseph that he did not have anything in his car except lamps, other items belonging to Ms. Faulk-Foster, and work tools for his job as a maintenance man.  Officer Joseph asked Mr. Miller, "you mind if we, you mind if I take a look in it?"  Mr. Miller replied, "I don't see why, I don't think that would be necessary."

**C.  The First Unlawful Search of Mr. Miller's Car:**

44.     Officer Joseph continued to pressure Mr. Miller to allow officers to the search his trunk, by stating, "I was just asking, man, 'cause you know, you say you don't have anything in there."

45.     Mr. Miller, at this point, felt a lot of pressure from the officer to open the trunk. Mr. Miller succumbed to Officer Joseph's pressure, saying, "you wanna look in my trunk?" Officer Joseph immediately said "yes."  Mr. Miller went to the driver's side of his car, reached in, and engaged the trunk-latch, opening the trunk of his car.  Officer Joseph, who was standing in front of Mr. Miller's trunk, could see that Mr. Miller had been entirely truthful.  As he had said, Mr. Miller had work tools and other personal items, but nothing suspicious and no contraband, including no dead bodies, in his trunk.

46.      Mr. Miller had opened the trunk of his car while Officer Dyer was sitting in her police cruiser typing information into her computer.  Seconds after Officer Dyer learned through

NCIC that Mr. Miller and his car were "clear," that she had absolutely no reason to suspect that he was involved in any criminal activity of any kind, and had no reason to suspect that he had any contraband in his car, Officer Dyer looked up and saw that Mr. Miller's trunk was open.

47.     Officer Dyer reacted immediately, exclaiming, "No." She stopped typing and got out of her cruiser. Another police officer, Officer John Wagner (Badge No. 2732) had just pulled up alongside her cruiser. Officer Dyer ordered Officer Joseph and Mr. Miller to "hold on for one second" as she turned to speak with Officer Wagner. Instead of releasing Mr. Miller and Ms. Faulk-Foster, as she should have, having completed her traffic stop investigation, Officer Dyer ordered Mr. Miller to step away from his car.

48.     Office Dyer gave a small laugh and turned to Officer Wagner, explaining: "I was trying to talk him [Officer Joseph] through consent, but he didn't let the dude reach back in the car, pop the trunk, so I have no idea where they are in the middle of getting consent." Officer Dyer then paused, and asked Officer Wagner: "Can you un-fuck this up?"

49.     Officer Dyer returned to her cruiser while sighing and stating, "Aw man." Approximately six minutes had elapsed since Officer Dyer initiated the traffic stop.

50.     Mr. Miller, who had stepped away from his car as instructed by Officer Dyer, was now approached by Officer Wagner, who asked Mr. Miller why he was stopped. Mr. Miller, increasingly bewildered at why so many different officers were getting involved in a simple traffic stop, again explained his understanding that Officer Dyer had stopped him because of a crack in his windshield. Mr. Miller told Officer Wagner that Officer Joseph had asked to search his car, which Mr. Miller said he thought "was unnecessary but I opened my trunk." Officer Wagner then stated to Mr. Miller, "So, so we can't search your car?" Mr. Miller responded that he did not "think that it's necessary, you don't have probable cause."

51.     Without any justification, and to the great surprise and horror of Mr. Miller and Ms. Faulk-Foster, Officer Wagner ordered them both to sit on the curb.  At this point, not only were Mr. Miller and Ms. Faulk-Foster being unlawfully detained well beyond any time frame justified by the initial traffic stop, but their movements were being controlled by the officers. Despite having done nothing wrong, Mr. Miller and Ms. Faulk-Foster were constructively arrested.

52.     Ms. Faulk-Foster asked for permission to join her daughter, Ms. Brown, who had parked the rental truck and was standing on the sidewalk up the street.  Officer Wagner said she could not, removing any doubt that both Mr. Miller and Ms. Faulk-Foster were now being detained against their will.

53.     Ms. Faulk-Foster became increasingly upset about being forced to sit on the ground on a busy road amidst police officers and cruisers, aware that her daughter and grandchild were watching, and that this whole ordeal was further delaying the family from proceeding with their plans to move her into her new home.

54.     Two other MCPD officers responded to the scene—Officer Michael Giacalone (Badge No. 2669) and Officer Michael Gruber (Badge No. 2570).

55.     Over the next few minutes, Ms. Faulk-Foster repeatedly asked the officers standing around her and Mr. Miller (including Officers Joseph, Wagner, Giacalone, and Gruber) if the officers' actions were standard procedure when someone has been stopped for a cracked windshield.  None of the officers answered Ms. Faulk-Foster's questions.

56.     Eventually, an officer stated that that the police were conducting "an investigation."  When Ms. Faulk-Foster asked, several times, what the officers were

investigating, the officer refused to answer.  Officer Joseph told Ms. Faulk-Foster that Officer Dyer would answer her questions, which she never did.

57.     Of course, there was no answer, because there was absolutely nothing to investigate.  Rather, the five known officers then on the scene were simply prolonging and escalating the detention of Mr. Miller and Ms. Faulk-Foster until they could come up with some reason to search Mr. Miller's car, in the apparent hope that such a search would uncover something they could use to retroactively justify their misconduct.

58.     Officer Wagner closed the trunk of Mr. Miller's car.  But, periodically over the next 25 minutes, Mr. Miller and Ms. Faulk-Foster watched as officers visually inspected the interior passenger compartment of the car, sometimes shining flashlights to get a view of the interior.  None of the officers claimed to observe any contraband whatsoever.

59.     After Mr. Miller told Officer Wagner that the officers did not have his consent or probable cause to search his car, Officer Wagner walked over to Officer Dyer's car and leaned in through the front, passenger-side window.  Officer Dyer, anticipating that Officer Wagner was going to tell her that Mr. Miller had refused a request to search the car, spoke first, asking Officer Wagner, "He said no?"  Officer Wagner replied, "he said no we don't have probable cause."  Officer Dyer replied, "it's fine."

60.     Officer Dyer then conducted a repeat search of the NCIC database, even though the search she had conducted just a few minutes previously had cleared Mr. Miller, and she had no legitimate reason to run a second computer search.  Instead, Officer Dyer's second computer search was part of her unlawful and unjustified fishing expedition to concoct probable cause. The repeat results were exactly the same as the results from her first search—Mr. Miller's car was cleared, his name was cleared, and his license status was valid, with no points.

61.     Yet even when that effort failed, Officer Dyer did not release Mr. Miller and Ms. Faulk-Foster.

62.     The officers flanking Mr. Miller and Ms. Faulk-Foster demonstrated that they too were committed to continuing the unconstitutional detention of the Plaintiffs.  An unidentified officer asked Officer Wagner if his colleagues had requested consent to search the car, and Officer Wagner replied "they already said no."  The unidentified officer then informed Officer Wagner that there was a K9 unit just around the corner.

63.     Officer Wagner, who had acknowledged to Officer Dyer just a few minutes before that the officers had no probable cause to search the car without Mr. Miller's consent, returned to Officer Dyer's passenger side window for a second time.  Officer Wagner repeated the unidentified officer's suggestion, telling Officer Dyer that a K9 unit was "right around the corner."  Officer Dyer apparently had the same thought about calling for a K9 unit, because she responded by telling Officer Wagner that the nearby K9 unit was "out of service" and "he's still held out," suggesting that K9 unit was not available.  Officer Wagner replied: "He is?  Oh, then, yeah I don't know then."  Officer Dyer told Officer Wagner, "I mean, it's not a big deal."

64.     Officer Wagner's statement "Oh, then I don't know then" and Officer Dyer's comment that it was "not a big deal" demonstrate their knowledge that they did not have any lawful reason for their continued detention of Mr. Miller and Ms. Faulk-Foster.

65.     Officer Dyer then said to Officer Wagner "it's not immediately apparent . . . like I kinda stuck my head in."  Upon information and belief, Officer Dyer meant that there was no apparent odor of marijuana coming from the car or no apparent contraband that could be seen in the interior compartment of Mr. Miller's car.  Officer Wagner responded, "Oh, well, let me . . . ." suggesting that he would look in the car to see if there was contraband visible or a smell of

18

marijuana that he could detect.  But, Officer Wagner immediately realized that Officer Dyer said she already had put her head in the car because he said "Oh, you already looked," suggesting that he was not going to do so again.  But then Officer Dyer said "You can look but . . . ." suggesting Wagner could try himself.  Officer Wagner did so.

66.     Upon information and belief, this exchange shows that multiple officers on the scene—at least Officers Dyer, Wagner, and the unidentified officer who suggested the K9 was right around the corner—knew that the officers had absolutely no basis to detain Mr. Miller and Ms. Faulk-Foster.  But rather than simply releasing them, the officers brainstormed ways to continue their illegal actions.

67.     Officer Wagner left Officer Dyer's car and began his own visual inspection of Mr. Miller's car.  Officer Wagner walked around the entire car, shining his flashlight through the open driver's side window, through the open front passenger-side door, and through the rear windows on both sides of the car.  Contrary to officers' later claims that they could not see into Mr. Miller's car because of its tint, the officers' body camera video shows that the officers were able to see the interior of Mr. Miller's car.

68.     During his inspection, one of the other officers asked Officer Wagner about the status of the K9 unit.  Officer Wagner replied "they're still held out on a call so I don't know if they're clear, and she says it's not a big deal, so I'm just seeing what I can see."

69.     Officer Wagner then continued his inspection of the inside of Mr. Miller's car which, again, revealed nothing suspicious.  While he was doing so, another officer again brought up the fact that a K9 unit was nearby.  He was now the fourth officer to suggest that officers bring a K9 unit to the scene to inspect Mr. Miller's car, without having any basis to conduct a search.

70.     Ms. Brown was, through all of this, observing the whole ordeal from some distance away on the sidewalk.  As Officer Wagner inspected the car interior, an unmarked silver four-door sedan pulled up at an angle directly in front of Mr. Miller's car and a person in civilian clothes, who did not identify himself, got out of the car.  Later, Plaintiffs would learn this person was Sergeant Paul Reese (Badge No. 1543).

71.     Despite his clear recognition that the other officers' conduct was unlawful, Sergeant Reese did nothing to stop it.  To the contrary, Sergeant Reese, who is White, returned to his car and shouted "Tupac lives!"  This was an apparent racial reference to Ms. Brown's shirt, which bore the image of the late musician Tupac Shakur with "TUPAC" in bold letters below the image.  Sergeant Reese's statement was bizarre, demeaning and, in context, constituted racial harassment.  Moreover, the entire interaction further demonstrates how casually MCPD officers approach serious infringements on the rights of civilians.

72.     Soon afterward, one of the other officers present and Officer Wagner gave Sergeant Reese a summary of the reason that Officer Dyer had stopped the car.  Sergeant Reese, their supervisor, did not end the detention, express surprise as to what the officers were doing, or in any way correct the misconduct.

73.     Sergeant Reese asked the two officers if Ms. Brown had been one of the occupants of the car.  Sergeant Reese's question suggests that when he made his racially tinged comment about Tupac Shakur, he believed that Ms. Brown might have been one of the occupants of the car who had been stopped by his colleagues.  Sergeant Reese then appeared as if he was going to leave the scene, asking as he walked toward his car if the other Defendant Officers needed a supervisor on the scene.  Officer Wagner told him that they did not need the assistance of a supervisor.

74.     Officer Wagner approached Officer Dyer's cruiser for a third time and again returned to the topic of a K9 search.  Officer Wagner said to Officer Dyer "I don't know how far along you are on your warnings if you want to hit K9 up." Officer Dyer had not begun to write any repair order.

75.     Prompted by Officer Wagner, Officer Dyer asked the dispatcher whether there were any K9 units available.  A K9 officer, unit K9-10, responded to Officer Dyer, asking if there was a need for a "CDS search," meaning a search for controlled dangerous substances, and saying he was available and would come to the scene.  At this point, Officer Dyer made an explicit decision to prolong the stop in order to bring in a K9 unit, despite have no basis to do so.

76.     K9-10 indicated he was en route to the scene one minute later.  However, almost immediately, K9-10 was diverted to investigate another matter.

77.     Mr. Miller and Ms. Faulk-Foster were not privy to the discussions among officers about the ways in which they could try to justify their continued detention of Mr. Miller and Ms. Faulk-Foster.  Mr. Miller repeatedly asked why the officers continued to detain them.  Ms. Faulk-Foster, who was uncomfortable sitting on the ground for a prolonged period of time, asked the officers standing nearby if what she and Mr. Miller were experiencing was standard procedure.  Their questions were ignored.

78.     At this point, more than 15 minutes had elapsed since Officer Dyer had stopped Mr. Miller and Ms. Faulk-Foster, ostensibly for a window obstruction.  For context, in 2016, the overwhelming majority of the 840,284 total number of traffic stops in the State of Maryland, 83.6%, lasted between zero and five minutes.  Moreover, 94% of Maryland traffic stops lasted

ten minutes or less, and 96.7% lasted 15 minutes or less.[1]  Thus, the Plaintiffs' detention at this

point had lasted longer than all but 3.3% of all traffic stops in Maryland, including stops for

reckless driving, hit and run, drinking and driving, and other serious incarcerable traffic offenses.

79.     Still waiting for the K9 unit to arrive, Officer Wagner returned to Officer Dyer's

cruiser for a fourth time.  Officer Wagner stated that Mr. Miller's car had "very dark tint" and

that he could not see in the back, and suggested that Officer Dyer write Safety Equipment Repair

Orders, which he referred to as an ERO.  In addition to the window tint, Officer Wagner further

suggested that Officer Dyer issue an ERO for a "modified exhaust" on Mr. Miller's car.  Officer

Dyer responded that she would "look those charges up," making clear that they were separate

from her original purported justification for stopping Mr. Miller and Ms. Faulk-Foster.

Defendant Officers had no legitimate reason to continue their detention of Plaintiffs.  Apparently

realizing this, Officer Wagner was suggesting new reasons to justify their continued unlawful

detention of Mr. Miller and Ms. Faulk-Foster.

80.     Officer Wagner informed Officer Dyer that Ms. Faulk-Foster was "talking a lot"

and was asking if this was "standard procedure just for a windshield."  Officer Wagner then

stated "what can you do, on to the next."  Upon information and belief, this exchange reflects

Officer Wagner's concern that Ms. Faulk-Foster might lodge a complaint.

81.     Officer Dyer replied to Officer Wagner that it would not be a "big deal" if the K9

unit did not arrive.  Officer Dyer's statement demonstrates that she did not reasonably believe

that a search of their persons or property, including Mr. Miller's car, would produce any drugs or

contraband.

---

[1]     Governor's Office of Crime Control & Prevention, *Thirteenth Report to the State of Maryland Under TR 25-113: 2016 Race Based Traffic Stop Data Analysis* 5–6, ch. 3 (Aug. 3, 2017).

82.     Nevertheless, rather than simply cancel the request for the K9 unit and release Mr.

Miller and Ms. Faulk-Foster, Officer Dyer continued their unlawful detention.  Because K9-10

was still delayed, a second K9 unit, K9-21, was dispatched.

83.     Approximately 28 minutes after Officer Dyer activated her body camera,

Corporal Michael Paul (Badge No. 1294), who used the call-sign K9-21, arrived.  There were

now *six* marked police cruisers at the scene, surrounding Mr. Miller's car on three sides (with the

curb on the fourth side).  Upon information and belief, Sergeant Reese, in his unmarked car, was

also still on the scene or nearby.

84.     Officer Dyer explained to Corporal Paul her supposed justification for calling a

K9 unit and for stopping Mr. Miller and Ms. Faulk-Foster in the first place.  "Just got the

excessive air fresheners, [unintelligible] on the rear view mirror and an item hanging on the gear

shift.  And the windshield obstruction which is what I stopped him for."  Video recordings from

officers' body cameras show that there was an air freshener hanging from Mr. Miller's rear view

mirror.

85.     The Plaintiffs, who observed Corporal Paul's arrival, did not know what was

happening.  The officers ordered Mr. Miller and Ms. Faulk-Foster to stand up from where they

had been ordered to sit on the curb and ordered them to move further away from the car and onto

the sidewalk.  An officer informed Mr. Miller that they were going to have a canine scan his car

and they could not be seated so close to the car.  Mr. Miller responded: "A canine scan?  You

don't have authorization to do that."  One of the officers responded: "we're going to do it, you

don't need authorization."

86.     As Mr. Miller and Ms. Faulk-Foster stood up and followed the order to move,

they were surrounded by four uniformed officers who moved with them, standing on either side

of and in between them.  When Mr. Miller put his hands in his pockets, Officer Wagner ordered

him to take his hands out of his pockets.  At another point, when Ms. Faulk-Foster walked

toward Officer Joseph in the direction of the street, Officer Joseph ordered her to return to the

sidewalk.

87.    Mr. Miller and Ms. Faulk-Foster watched as Corporal Paul brought his dog out.

When Corporal Paul began his canine inspection of Mr. Miller's car, approximately 30 minutes

had elapsed from time Officer Dyer activated her body camera.  In 2016, 99% of traffic stops in

Maryland lasted 30 minutes or less.[2]

88.    Corporal Paul guided his dog around Mr. Miller's vehicle, including up to the

open front passenger side door of the car.  After completing his scan, Corporal Paul told Officer

Dyer: "He's indicating and he's not sticking his head in the door, it's more on the door handle on

that side, but it's enough.  So, I mean, did he say anything about anything in there?"  Officer

Dyer replied, "No, it was 'you don't have PC for the stop, don't have PC for the search,'"

meaning that Mr. Miller had told the officers they did not have probable cause.  Corporal Paul

responded "All's [sic] I can tell you is he indicated, I think it was more on the," at which point

Officer Dyer said "passenger side" and Corporal Paul responded "yes."  Officer Dyer said

"Okay, that's fine. I appreciate it" and Corporal Paul replied "Okay, let me know what you're

gonna do."

89.    This exchange again illustrates that the shared goal of the officers was to find

some basis—any basis—upon which to justify further searches of the Plaintiffs.  Furthermore,

upon information and belief, neither Corporal Paul nor Officer Dyer believed that the canine's

supposed alert established probable cause to believe there were any drugs *inside* Mr. Miller's car.

---

[2]    *Id.*

**D. The Unlawful Arrests:**

90.     Ignoring the overwhelming evidence before her that no crime had been committed, Officer Dyer directed the officers to arrest Mr. Miller and Ms. Faulk-Foster. Approximately 32 minutes had elapsed since Dyer activated her body camera.

91.     To the great humiliation and anguish of Mr. Miller and Ms. Faulk-Foster, Officers Dyer, Joseph, Wagner, and Giacalone handcuffed them, formally placing them under arrest.

92.     Mr. Miller asked the officers "What did I do?"  Officer Dyer told Mr. Miller that the officers were "placing you into custody" and "taking you as part of the stop."  She said both the vehicle and Mr. Miller and Ms. Faulk-Foster's persons would be searched.  Upset by the implications, Mr. Miller asked the reason for the searches and Officer Dyer said that "the K9 hit on the vehicle."

93.     Ms. Faulk-Foster, visibly distraught as the officers handcuffed her, repeatedly said she did not want to be arrested and asked why officers were putting handcuffs on her. Officer Dyer claimed the officers were not arresting the Plaintiffs, but simply detaining them. This was untrue.  Ms. Faulk-Foster and Mr. Miller were under arrest in violation of their constitutional rights and without probable cause.

94.     Ms. Faulk-Foster asked "why are you detaining me?"  Officer Dyer informed Ms. Faulk-Foster that she was being detained "based on the investigation, the K9 hit on the car, which says there is drugs in the car."  Ms. Faulk-Foster repeatedly expressed concern for her need to complete her move that day.

95.     Ms. Faulk-Foster asked the officers to bring her purse to her once it had been searched.  Officer Dyer refused to return Ms. Faulk-Foster's purse to her until the full search, described below, was completed.

96.     Ms. Faulk-Foster asked the officers to loosen her handcuffs because they felt too tight on one of her wrists.  Officer Joseph told her that the handcuffs were "supposed to be uncomfortable, not comfortable."  Only when Ms. Faulk-Foster said that the handcuffs felt like they were pressing on her bone did an officer adjust them.

97.     Ms. Faulk-Foster began to cry while standing in handcuffs on the sidewalk.  At one point, before Officer Dyer searched Ms. Faulk-Foster (described below), Officer Joseph told Ms. Faulk-Foster several times to breathe, apparently believing that she might hyperventilate.

**E.  The Unlawful Searches of Plaintiffs and the Further Searches of their Property:**

98.     Still lacking any reason to believe that Ms. Faulk-Foster had any drugs or contraband on her person and without Ms. Faulk-Foster's consent, Officer Dyer patted down every part of Ms. Faulk-Foster's body on the outside of her clothes, including her breasts and groin area.  Officer Dyer felt Ms. Faulk-Foster's hair with her fingers, including under her head scarf.  She reached into all of Ms. Faulk-Foster's pockets and inside the waistband of her jeans, and forced her to remove her boots, which Officer Dyer also searched.  Officer Dyer found no contraband on Ms. Faulk-Foster.

99.     Officer Giacalone simultaneously searched Mr. Miller without probable cause to believe that he had any drugs or contraband on his person and without Mr. Miller's consent.  Mr. Miller felt the officer pat down every part of his body over his clothes, including his groin and buttocks area.  The officer searched each of Mr. Miller's pockets and inside the waistband of his jeans, and forced Mr. Miller to remove his shoes, which he also searched.  Mr. Miller was upset.  Mr. Miller repeatedly told the officers that he did not have any drugs, that he does not use drugs, and that he did not have anything in his car.  Officer Giacalone found no contraband on Mr. Miller.

100.    While the police were searching Mr. Miller and Ms. Faulk-Foster, Sergeant Reese drove past the scene, chanting "Tupac lives" repeatedly into the public address system of his police cruiser.  This was Sergeant Reese's second use of this race-based comment.  Several officers present laughed when they heard Sergeant Reese's racist remark.

101.    After officers searched them, the officers sat Mr. Miller and Ms. Faulk-Foster back on the curb behind one of the police cruisers.  An officer stood directly behind them to monitor them.

102.    Simultaneously, Officer Wagner searched Mr. Miller's vehicle while Officer Gruber searched Ms. Faulk-Foster's purse.  Officer Gruber emptied the contents of the purse onto the rear trunk of Mr. Miller's car.  Officer Dyer joined Officer Gruber as he searched Ms. Faulk-Foster's purse.  Officer Gruber showed Officer Dyer a small plastic container in the shape of a cupcake and said it had a liquid which looked like bubbles, prompting Officer Dyer to open it and say it "doesn't smell like PCP," and Officer Gruber agreed.  After searching Ms. Faulk-Foster's purse, the officers concluded that it contained no drugs or contraband.

103.    Officer Dyer approached Officer Wagner, who was searching the interior of the passenger compartment of Mr. Miller's car.  Officer Dyer asked Officer Wagner if he found anything during his search of Mr. Miller's car.  Officer Wagner said "no."  Officer Dyer then said that the dog had alerted on "her side of the car" (the passenger side) and asked Officer Wagner "did you search her side of the car really well?"  Officer Wagner replied "yeah."  Officer Dyer told Officer Wagner she was going to let them go, and Officer Wagner responded "are they complaining, still?" and repeated his question to Officer Dyer two more times, when she apparently did not hear him.  Officer Dyer responded, "it doesn't matter . . . if there's nothing in the car, there's no need to stay out here."

104.    Upon information and belief, this exchange reflects Officer Wagner's and Officer Dyer's awareness that their detention, search and their arrest of Mr. Miller and Ms. Faulk-Foster were unlawful.  It also reflects their concern that the Plaintiffs might lodge a complaint about the officers' misconduct.  Upon information and belief, Officer Dyer's statement that "it doesn't matter," which echoed her prior comment that it was "fine" when Officer Wagner had pointed out that Mr. Miller had refused to consent to search his car, reflected Dyer's resignation to the reality that the officers repeated efforts to concoct some justification for the unconstitutional detention of Mr. Miller and Ms. Faulk-Foster had consistently failed.

105.    Once informed that the searches did not yield any illicit items, Corporal Paul noted that this was consistent with the dog showing no interest in the car aside from the door handle, indicating that Corporal Paul understood that the dog's initial reaction to the door handle but not the interior of the car did *not* provide probable cause to search the inside of the car. Nevertheless, the officers continued their search, opening the trunk of Mr. Miller's car again to search it, even though Officer Joseph's prior inspection of it had revealed nothing illegal.  The officers did not find any drugs or other illegal items after searching Mr. Miller's trunk a second time.

106.    Officer Dyer removed the handcuffs from Ms. Faulk-Foster and Mr. Miller, finally releasing them from their unlawful detention and arrest.  At this point, the Defendant Officers' detention of Plaintiffs had lasted over 40 minutes, far longer than 99% of all traffic stops in Maryland in all of 2016 (and 46 minutes had passed since Officer Dyer activated her body camera).

107.    After the handcuffs were removed, Ms. Faulk-Foster told Officer Dyer twice that she was "still shaking" because she had never been arrested.

108.    After removing the handcuffs from Mr. Miller, Officer Dyer informed Mr. Miller:

I am issuing a warning for the windshield obstruction and issuing a work order for the tint as well as the exhaust because it is aftermarket exhaust.  Take them to a mechanic, take them to an officer, if they say yes that was appropriate.  You can go in and have it checked by a mechanic to ensure that you have legal exhaust . . . .

109.    Officer Dyer then revealed to Mr. Miller the actual reason she detained him:

I heard you talking to my partner saying I did not tell you this or I did not tell you that.  What I will say is that I work in a proactive unit.  I am specifically looking for guns and drugs.  I am looking for quality of life issues . . . . Unfortunately when I walk up to someone and say "Hey, do you have drugs in your car," they immediately tell me "No."  So, there are certain steps that I have to go through, just to make sure my investigation is complete.  And I am confident that there are no drugs in your car, no drugs on your person, there is nothing illegal, there is not a dead body in the trunk, none of those things.  So, yes, I believe that you are a great person and you would tell me if something was, but I don't run into you every day.  So, I do apologize for the inconvenience.  This is your paperwork and information back.

110.    Upon information and belief, Officer Dyer's comment that her actions were undertaken as part of her work as a member of a "proactive unit" indicates that those actions were taken as part of a pattern of conduct authorized and approved by the MCPD and by Montgomery County.

111.    Officer Dyer presented Mr. Miller with the warning and repair orders.  Mr. Miller asked what the specific problem was with the exhaust system on his car.  Officer Dyer refused to provide any additional explanation.  Mr. Miller also asked Officer Dyer what the specific problem was with the window tint on his car.  Officer Dyer responded that she could not see through it.  This was false.  The body camera videos show that officers could see through the windows inside Mr. Miller's car despite the window tint.

112.    At roughly 2:50 p.m., almost an hour after Officer Dyer's stop of Mr. Miller and Ms. Faulk-Foster, ostensibly for a window obstruction, the Defendant Officers released the Plaintiffs from their illegal detention and they were permitted to leave the scene.

113.    Although Maryland law requires MCPD to report to the State of Maryland all searches its officers conduct during traffic stops (Maryland Tr. Art. § 25-113), upon information and belief, MCPD did not report that it conducted a search during this traffic stop.  The data that Maryland provided in response to Plaintiffs' public information act request indicates that the officer associated with the stop of Mr. Miller's car conducted only one stop in 2016, and it was of a Hispanic person.

**F.  The MCPD's Pattern and Practice:**

114.    Upon information and belief, the MCPD has a pattern and practice of unlawfully detaining motorists during traffic stops for unjustified, prolonged periods of time, after any legitimate investigatory reasons related to the initial stop have disappeared, with the goal of searching their persons, belongings, and vehicles in the hope of finding drugs, guns, or other contraband.   Upon information and belief, this pattern includes unlawfully detaining motorists until the arrival of a K9 unit in order to justify searching vehicles and their occupants.

115.    Upon information and belief, the MCPD trains its officers in methods to coerce motorists during traffic stops into consenting to searches of their vehicles under circumstances where such consents are not freely and voluntarily given.

116.    Upon information and belief, the MCPD training includes instructing officers to ask motorists ridiculous questions during traffic stops, such as whether they have military grade weapons (for example bazookas) or dead bodies in the trunks of their vehicles.

117.     Upon information and belief, the MCPD training instructs officers to ask motorists such questions to create anxiety in motorists and to make motorists feel uncomfortable in order to pressure them into consenting to searches against their free will by asserting that if the motorists have nothing to hide, they would consent to searches.  The script of questions that Officer Dyer provided to Officer Joseph, and specifically her characterization of some of the questions as "ridiculous," is evidence that such tactics are planned and trained.

118.     Upon information and belief, MCPD has authorized officers, particularly those in "proactive units" to prolong detentions and conduct searches in contravention of the Fourth Amendment.  Officer Dyer's statement to Mr. Miller after removing his handcuffs that she works in a "proactive unit" that is "specifically looking for guns and drugs" and that there are "certain steps that [she] has to go through to make sure [her] investigation is complete" is evidence that these tactics are part of MCPD's pattern and practice of training and conduct by its officers. That the supervisor on scene did not terminate the clearly unlawful detention of Mr. Miller and Ms. Faulk-Foster is evidence that such tactics are authorized by MCPD.

119.     The MCPD has a pattern and practice of targeting African-Americans and other people of color for disparate treatment based on their race and ethnicity.  As reflected in the ordeal to which Mr. Miller and Ms. Faulk-Foster were subjected, this pattern includes disproportionately stopping people of color for pretextual reasons and then subjecting them to unlawful detentions, searches, and arrests.  Upon information and belief, this pattern and practice is the result of intentional discrimination against people of color based on their race and ethnicity.

120.     Upon information and belief, the MCPD fails to properly train and supervise its officers to prevent officers from targeting African-Americans and other people of color for

disparate treatment based on their race and ethnicity and to prevent them from disproportionately stopping people of color for subjective reasons.

121.    The evidence of the MCPD's unlawful patterns and practices includes data issued by MCPD and reported by it to State of Maryland authorities, and the pattern of conduct of MCPD officers with respect to other traffic stops separate from the May 2, 2016 stop of Mr. Miller and Ms. Faulk-Foster.  This pattern includes Mr. Miller's prior experiences during traffic stops by MCPD officers and experiences of other motorists of color.

122.    MCPD publishes data concerning the Traffic Notices that flow from traffic stops that its officers issued between 2012 and the present at https://data.montgomerycountymd.gov/Public-Safety/Traffic-Violations/4mse-ku6q/data.  The data reveal stark disparities based on race and ethnicity in the issuance of certain types of Traffic Notices by MCPD officers.  MCPD officers issue Traffic Notices for speed violations (more objective reasons for traffic stops) in proportions that are roughly equivalent to the racial and ethnic makeup of Montgomery County residents.  In contrast, MCPD officers issue Traffic Notices for equipment issues (relatively more subjective reasons for traffic stops) to motorists of color in numbers that are disproportionate to the racial and ethnic makeup of Montgomery County residents.

123.    Approximately 53% of the more than 237,000 Traffic Notices issued for speeding were issued to motorists of color (24.8% Black; 15.2% Hispanic; 7.1% Asian; 6% Other; 0.1% Native American) and 46.5% were issued to White motorists.[3]

---

[3]    dataMontgomery, Traffic Violations, https://data.montgomerycountymd.gov/Public-Safety/Traffic-Violations/4mse-ku6q/data (last visited Apr. 29, 2019).

124.    In contrast, just shy of 80% of the almost 7000 Traffic Notices issued by MCPD

officers for windshield obstruction (the reason Officer Dyer said she stopped Mr. Miller) were

given to people of color (34.6% Hispanic; 33.4% Black; 5.2% Other; 4.6% Asian; 0.2% Native

American), while only 21.7% were issued to White motorists.  Similarly, of the over 3500

Traffic Notices issued for equipment violations related to exhaust systems (one of the Repair

Orders that Officer Dyer issued to Mr. Miller), over 73% were issued to motorists of color

(47.3% Hispanic; 16.2% Black; 4.7% Other; 4.6% Asian; 0.3% Native American), but just

26.7% were issued to White motorists.  And of the over 21,000 Traffic Notices issued as a result

of various issues related to window tint (the other Repair Order that Dyer issued to Mr. Miller),

76% were issued to motorists of color (36% Black; 30.5% Hispanic; 5.3% Other; 4.2% Asian;

0.1% Native American), while only 23.6% were issued to White motorists.[4]

125.    According to United States Census Bureau data, as of July 1, 2018, 43.8% of the

residents of Montgomery County identified themselves as White (not Hispanic), 19.7%

identified themselves as Black, 19.6% identified themselves as Hispanic, 15.6% identified

themselves as Asian, and 3.4% identified themselves as being two or more races.[5]

126.    Thus, as noted above, Traffic Notices for speeding violations, which are relatively

more objective violations, are distributed by MCPD officers in numbers that more closely track

the racial and ethnic demographics of Montgomery County residents.  In contrast, the Traffic

Notices for the more subjective equipment issues are issued by MCPD officers in far higher

numbers to motorists of color than to their White counterparts.  Upon information and belief, the

---

[4]    *Id.*

[5]    United States Census Bureau,
       https://www.census.gov/quickfacts/fact/table/montgomerycountymaryland/PST045218 (last visited Apr. 29,
       2019).

disparities in the Traffic Notices MCPD officers gave to motorists of color for issues related to motor vehicle equipment compared to those issued to motorists who are White are the result of intentional racial discrimination.

127.    Published data also shows that MCPD officers search African-American motorists at significantly higher rates than White motorists.  In 2016 MCPD officers searched 4.4% of the African-American motorists they stopped, compared to only 2.5% of the White motorists they stopped.  Forty-four percent of all of the motorists who MCPD officers searched  in 2016 were African-American, 26% were White, and 23% were Hispanic.   Moreover, it appears that this data drastically undercounts the searches that MCPD officers actually conduct.  For example, this data fails to include the search that conducted during the stop of Mr. Miller's car: according to this data, the officer associated with the stop of Mr. Miller's car conducted only one search in 2016, and that search was of a Hispanic person.

128.    Data produced by the Governor's Office of Crime Control & Prevention of traffic stops by in 2015 demonstrate similar troubling disparities in how MCPD officers treat motorists of color versus White motorists.  When stopped, motorists of color are disproportionately subjected to longer stops—stops lasting 15 minutes or longer (longer than would necessary to issue a simple citation and let motorists go on their way)—compared to White motorists.  The 2015 data also show that, when stopped by MCPD officers, motorists of color are disproportionately subjected to searches of their persons and/or property, compared to White motorists.

129.    In addition to these troubling and racially disparate patterns revealed by MCPD's traffic data, MCPD officers practice of unlawfully prolonging stops to conduct searches, especially of motorists of color is revealed by the individual experiences of drivers.  The

misconduct that occurred during the stop of Mr. Miller and Ms. Faulk-Foster was not an isolated

incident.  Mr. Miller has previously been stopped on multiple occasions by MCPD officers.

130.    In approximately 2002, when he was about 19 years old, Mr. Miller was driving

with friends who were passengers in his car.  Mr. Miller was stopped by MCPD officers.  The

officers removed Mr. Miller and his friends from the car, placed them in handcuffs, searched

them, and ordered them to sit on the curb.  MCPD officers called for a K9 unit and, after the

canine arrived, MCPD officers then searched Mr. Miller's car.  The officers found nothing

during their searches and let Mr. Miller and his friends leave.  The officers told Mr. Miller that

they conducted the search because officers smelled marijuana.

131.    In approximately 2008 or 2009, while driving in Montgomery County in the area

near Randolph Road and Georgia Avenue (near where he and Ms. Faulk-Foster were stopped on

May 2, 2016), Mr. Miller was stopped by MCPD officers.  MCPD officers asked Mr. Miller to

get out of his car and to stand on the curb.  Officers then searched his car and they found no

contraband or drugs.  Mr. Miller was then allowed to continue on his way.

132.    As a result of his traffic stop experiences with the MCPD, Mr. Miller who lived in

Montgomery County from when he was in the third grade until he was in his late 20s, when he

moved Prince George's County, has made a habit of avoiding as much as possible driving in

Montgomery County so he would not have to endure such experiences.

133.    Mr. Miller is not alone in this treatment.  Other motorists of color have similarly

been subjected to unduly lengthy detentions after officers claimed to smell marijuana where none

existed.  In 2016, an MCPD officer stopped a seventeen-year-old Hispanic youth in Ashton,

Maryland, allegedly due to air fresheners that were obstructing the windshield.  The officers told

the young man that they smelled marijuana and instructed him and his passenger to get out of the

car.  MCPD officers then searched the driver and passenger and made them wait on the side of

the road.  The MCPD officers threatened to handcuff the young men when they protested their

detentions.  The two young men were made to wait for a K9 unit to show up.  The MCPD K9

officer claimed that his dog indicated near the window of the vehicle and MCPD officers then

searched the car.  The search turned up no marijuana, other drugs, or any other contraband.  The

entire stop took approximately 90 minutes.

     134.    Other young people of color have had similar experiences with MCPD officers.

One local high school senior, an African-American teenager, described being stopped twice in

the same Sunday night by MCPD officers while on his way home from church.  The student said

the first officer told him that his "'car was too close to the ground, that the exhaust was illegal,

that the window in the back was too big. Later that night, [he] was pulled over again.'" [6]

Another high school student described being stopped at night by an MCPD officer, supposedly

for tapping his brakes a few times.  The student described being questioned by the officer in a

hostile and accusatory manner, including accusations that the officers smelled drugs, and being

detained for up to an hour.  "Young black men interviewed for this article said they have learned

to be constantly wary of police."[7]

     135.    Upon information and belief, Mr. Miller's multiple experiences, and the

experiences of others, show that Montgomery County police have a practice of subjecting

motorists of color to unduly prolonged searches wherein they are handcuffed, or threatened with

handcuffs, and forced to wait for K9 units and then required to watch their vehicles be searched

---

[6] Emily Schrader, *How Black Lives Matter Changed the MCPD*  The Tattler (Dec. 18, 2018),
http://tattlerextra.org/wordpress1/2018/12/18/how-black-lives-matter-changed-the-mcpd-2/ [last checked Apr. 29,
2019].
[7] *Id.*

based on dubious claims of smelling marijuana, when none existed.  Upon information and

belief, subjecting motorists of color to such experiences is a common practice by MCPD officers.

**G. The Impact and Events Following the MCPD Officers Unlawful Treatment of Mr. Miller and Ms. Faulk-Foster:**

136.   Throughout their encounter with the officers, Mr. Miller and Ms. Faulk-Foster

were serious, concerned and, at times, visibly upset, about the ordeal to which the Defendant

Officers subjected them.

137.   At some point during their ordeal, the unidentified African-American officer who

was present at the scene asked Ms. Faulk-Foster why they were stopped.  Ms. Faulk-Foster told

the officer that Officer Dyer had said they were stopped because of their cracked windshield.

The African-American officer looked at the windshield and stated something to the effect of,

"This isn't right.  I don't want any part of this."  The unidentified African-American officer then

got into his police cruiser and, at some point later, left the scene.

138.   In contrast to the unidentified African-American officer, several of the officers

were dismissive, abrupt, and impolite toward Mr. Miller and Ms. Faulk-Foster at various times

during their illegal detention, even laughing on a few occasions, including when Sergeant Reese

made racist comments about Ms. Brown's Tupac Shakur t-shirt.  Some of the officers behavior

indicated that, to them, the Plaintiffs' detention was a humorous event.  Even at the end of the

encounter, when Mr. Miller had walked back to his car and was getting ready to leave the scene,

one of the officers commented to the others that Lekeisha Brown was still filming the encounter,

and several officers laughed.

139.   Mr. Miller and Ms. Faulk-Foster have been significantly impacted by the MCPD

officers' mistreatment of them.  They both suffered fear, shame, and humiliation at being treated

as if they were criminals.  They were forced to sit in handcuffs on the side of the road in broad

daylight, on a busy weekday afternoon, while other motorists drove by, while their children, and in Ms. Faulk-Foster's case, grandchild, looked on.  The pain and humiliation they experienced is all the more traumatic because the circumstances that were vividly obvious to the MCPD officers—the rental truck driven by Lakeisha Brown, the lamps and other furniture visible in the backseat of Mr. Miller's car, and the consistent explanations provided by the pair—that Mr. Miller and Ms. Faulk-Foster were simply moving Ms. Faulk-Foster's belongings from one home to another, suggested behavior that was entirely innocent and would not have aroused the officers' misplaced suspicion but for their race.

140.    Both Mr. Miller and Ms. Faulk-Foster felt even more violated and humiliated when they heard Sergeant Reese repeatedly make racially derogatory comments about Ms. Brown's Tupac Shakur t-shirt.  And they felt humiliation when MCPD officers standing by them laughed at such outrageous racially discriminatory statements.

141.    Given the high profile incidents across the United States in recent years of police-officer-involved shootings of unarmed African-American motorists, Mr. Miller and Ms. Faulk-Foster both feared, during the MCPD officers' unlawful detention of them, that they might be shot and wounded, or killed, by one of the officers.

142.    The Defendants' actions caused Ms. Faulk-Foster to experience additional anxiety that she might miss the opportunity to move her belongings into her new home before the property manager left for the day.  She did not know where she would store her belongings.  As a result of the Defendants' actions, she had to extend the rental contract on the rental truck because the pair was exhausted when they finally arrived at her home.

143.    Due to the  Defendants' conduct and their violation of her rights, Ms. Faulk-Foster was handcuffed by police officers for the first time in her life and made to feel like a criminal.

144.    As a result of this incident, Ms. Faulk-Foster is distrustful of police officers and questions the lawfulness of their actions toward others in the community.

145.    Mr. Miller was concerned during the traffic stop that he would lose his job as an assistant maintenance supervisor, which he had held for years.  As noted above, because of his prior experiences of unjustified treatment by MCPD officers, Mr. Miller avoids driving in Montgomery County, except for special occasions, like moving Ms. Faulk-Foster or attending a relative's birthday celebration.

146.    Mr. Miller and Ms. Faulk-Foster had to suffer the experience of having their then-two-year-old son and grandson, respectively, witness their being handcuffed and humiliated by the police.  After this incident, the little boy questioned why the police treated them that way, and they had to struggle to explain the police officers' actions to him.

147.    On September 12, 2016, Mr. Miller and Ms. Faulk-Foster gave written notice of potential claims stemming from this incident to Montgomery County pursuant to Maryland's Local Government Tort Claims Act, MD. Code Ann. Cts. & Jud. Proc. § 5-301.

148.    MCPD issued a written reprimand to Sergeant Reese for his conduct during this incudent.  None of the other officers involved in the incident received any punishment for their misconduct related to this incident.

## CLAIMS FOR RELIEF

### Count I

**Plaintiffs' 42 U.S.C. § 1983 Unlawful Detention Claims for Deprivation of Liberty Under the Fourth and Fourteenth Amendments of the U.S. Constitution
(Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendants in their Individual Capacities)**

149.     Plaintiffs hereby incorporate by reference paragraphs 1 through 148 and further allege as follows:

150.     At all times relevant hereto, Plaintiffs had a clearly established right under the Fourth Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment to the U.S. Constitution, to be free from unreasonable seizures.

151.     Defendant Officers named in Count I, acting under color of Maryland law, improperly detained Mr. Miller and Ms. Faulk-Foster beyond the time and scope allowable for a *Terry* stop[8] pursuant to the Fourth Amendment, without reasonable articulable suspicion to believe that they had violated the law or were in possession of illegal contraband.

152.     Defendant Officers named in Count I improperly detained Mr. Miller and Ms. Faulk-Foster well beyond the time necessary to effectuate the purpose of the stop, ostensibly to investigate a windshield obstruction.  The officers unlawfully detained Mr. Miller and Ms. Faulk-Foster after Mr. Miller demonstrated and the officers confirmed that Mr. Miller was entitled to operate his vehicle, had a valid driver's license, vehicle registration, and insurance, and had no outstanding warrants.  The officers thereafter engaged in a prolonged detention of Mr. Miller and Ms. Faulk-Foster in order to improperly investigate if there were drugs in Mr.

---

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

Miller's car without reasonable articulable suspicion to believe that any drugs were present in his car, and without any other lawful reason to detain Mr. Miller and Ms. Faulk-Foster.

**Count II**

**Plaintiffs' 42 U.S.C. § 1983 Claims for Unlawful Search and Deprivation of Liberty Under the Fourth and Fourteenth Amendments of the U.S. Constitution (Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, and Paul in their Individual Capacities)**

153.　Plaintiffs hereby incorporate by reference paragraphs 1 through 152 and further allege as follows:

154.　At all times relevant hereto, Plaintiffs had a clearly established right under the Fourth Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment to the U.S. Constitution, to be free from unreasonable searches.

155.　Defendant Officers named in Count II, acting under color of Maryland law, conducted multiple searches, each of which the officers performed without probable cause to believe that Mr. Miller and Ms. Faulk-Foster had committed any crime and without probable cause to believe that they were in possession of any illegal contraband, in violation of their rights under the Fourth Amendment.

156.　The officers, acting under color of Maryland law, searched Mr. Miller's car, including two searches of the trunk of his car, without Mr. Miller's knowing and voluntary consent and without probable cause to believe that the car, or the trunk, contained any illegal contraband, in violation of Mr. Miller's rights under the Fourth Amendment.

157.　The officers, acting under color of Maryland law, searched Mr. Miller and Ms. Faulk-Foster's persons without probable cause to believe that they possessed any illegal contraband, in violation of their rights under the Fourth Amendment.

41

158.     The officers, acting under color of Maryland law, searched Ms. Faulk-Foster's purse without probable cause to believe that it contained any illegal contraband, in violation of her rights under the Fourth Amendment.

159.     Given the totality of the circumstances and the information known by the officers, no prudent person of caution would reasonably believe that any drugs or other contraband was on the person of Mr. Miller or Ms. Faulk-Foster or were present in Mr. Miller's car or Ms. Faulk-Foster's purse.

### Count III

**Plaintiffs' 42 U.S.C. § 1983 Unlawful Arrest Claims and Deprivation of Liberty Under the Fourth and Fourteenth Amendments of the U.S. Constitution
(Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendants in their Individual Capacities)**

160.     Plaintiffs hereby incorporate by reference paragraphs 1 through 159 and further allege as follows:

161.     At all times relevant hereto, Plaintiffs had a clearly established right under the Fourth Amendment to the U.S. Constitution, as incorporated against the states through the Fourteenth Amendment to the U.S. Constitution, to be free from unreasonable seizures.

162.     Defendant Officers named in Count III, acting under color of Maryland law, arrested Mr. Miller and Ms. Faulk-Foster, without probable cause to believe that they had committed any crime, in violation of their rights under the Fourth Amendment.  The officers, acting under color of Maryland law, handcuffed Mr. Miller and Ms. Faulk-Foster without probable cause to believe that had committed any crime, in violation of their rights under the Fourth Amendment.

163.     Given the totality of the circumstances and the information known by the officers, no prudent person of caution would reasonably believe that Mr. Miller or Ms. Faulk-Foster had committed any crime at the time the officers arrested them.

**Count IV**

**Plaintiffs' 42 U.S.C. § 1983 Failure to Intervene Claims**
**(Against Defendants Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendants in their individual capacities)**

164.     Plaintiffs hereby incorporate by reference paragraphs 1 through 163 and further allege as follows:

165.     In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, the Defendants Officers named in Count IV stood by without intervening to prevent other Defendants from violating Plaintiffs' constitutional rights, even though the Defendant Officers named in Count IV had the opportunity to so intervene.

166.     Officers Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendant Officers failed to intervene in the unlawful prolonged detention of Mr. Miller and Ms. Faulk-Foster without reasonable articulable suspicion to believe that they had committed any crime or were in possession of any illegal contraband.

167.     Officer Reese and the John and Jane Doe Defendants, as well as any of the other Defendant Officers named in Count IV who did not actively participate in any search or arrest, failed to intervene in the unlawful arrests of Mr. Miller and Ms. Faulk-Foster and the unlawful searches of Mr. Miller's and Ms. Faulk-Foster's persons and property without probable cause to believe that they had committed any crime or were in possession of any illegal contraband.

168.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

169.    The actions of the Defendants named in Count IV were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 2016 would have believed that their actions were lawful.

170.    As a direct and proximate result of the officers' failure to intervene, the Plaintiffs were wrongfully detained, arrested, and searched, and their property was also illegally searched, and they suffered the other grievous and continuing injuries and damages as set forth above.

**Count V**

**Plaintiffs' 42 U.S.C. § 1983 Claims for Supervisory Liability Against MCPD Supervisors (Against Defendants Reese, Paul, and John and Jane Doe Defendants in their Individual Capacities)**

171.    Plaintiffs hereby incorporate by reference paragraphs 1 through 170 and further allege as follows:

172.    Sergeant Reese, Corporal Paul, and the John and Jane Doe Defendant Officers, as well as any of the other Defendant Officers who had supervisory responsibility, were personally involved in the stop, detention, arrest, and search of the Plaintiffs and/or had actual or constructive knowledge that their subordinate officers were engaging in conduct that posed a serious and unreasonable risk of constitutional injury to citizens like the Plaintiffs.

173.    Sergeant Reese, Corporal Paul, the John and Jane Doe Defendant Officers, and any of the other Defendant Officers with supervisory responsibility, by deliberately and/or recklessly failing to supervise their subordinate officers, and by their active and direct

participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive the Plaintiffs of their clearly established constitutional rights.

174.    Sergeant Reese, Corporal Paul, the John and Jane Doe Defendant Officers, and any of the other Defendant Officers with supervisory responsibility allowed their subordinates to act with reckless disregard and created an environment where subordinates were not supervised, disciplined, or trained, and in which those subordinates knew that their violations of the Plaintiffs' constitutional rights would be facilitated, approved, and/or condoned by the supervisory Defendants.

175.    As a direct and proximate result of the actions of Sergeant Reese, Corporal Paul, the John and Jane Doe Defendant Officers, and any of the other Defendant Officers with supervisory responsibility, the Plaintiffs were illegally detained, arrested, and searched, and their property was illegally searched, causing the Plaintiffs to suffer the other grievous and continuing injuries and damages as set forth herein.

## Count VI

### Plaintiffs' 42 U.S.C. § 1983 Claims
### (Failure to Train, Failure to Supervise, and Condoning its Officers' Unlawful Conduct)
### (Against Defendant Montgomery County, Maryland)

176.    Plaintiffs hereby incorporate by reference paragraphs 1 through 175 and further allege as follows:

177.    Montgomery County, Maryland was at all times relevant to this Complaint responsible for the policies, practices, and customs of the MCPD.

178.    The actions of each of the individual Defendants were undertaken pursuant to a policy, practice and/or custom of the MCPD, which included but was not limited to:

- Spending excessive time, to issue traffic citations, warnings, or Safety Equipment Repair Orders, as a pretext to prolong the unlawful detention of motorists;

- Repeating computer searches of law enforcement databases in order to prolong the detention of motorists beyond the time necessary to issue appropriate citations, warnings, or Safety Equipment Repair Orders;

- Using alleged motor vehicle equipment violations as pretexts to prolong the unlawfully detention of motorists in order to conduct unjustified searches or other improper investigations for contraband, such as drugs or weapons;

- Asking motorists outrageous questions, such as whether they have any military grade weapons (for example, a bazooka) or dead bodies in their vehicles, to coerce them into giving consent against their will for unjustified searches of their vehicles and property;

- Requesting K9 units to perform canine scans, and illegally detaining motorists while awaiting the arrival of K9 units, when officers have no reasonable articulable suspicion to believe that motorists or their vehicles contain any controlled dangerous substances.

- Unlawfully restricting motorists movement and liberty, including by ordering that they sit on the curb, while officers conduct unjustified canine scans or searches of their vehicles;

- Unlawfully arresting motorists, by placing them in handcuffs without probable cause to believe they had committed any crime and without reasonable articulable suspicion to believe that they were in possession of any contraband or weapons; and

- Unlawfully searching motorists' persons and their property without probable cause to believe they possessed any contraband or weapons.

179.     Montgomery County, Maryland condoned all of these policies by failing to put a stop to or correct the widespread pattern of unconstitutional conduct taking place at the MCPD.

180.     Montgomery County, Maryland also failed to properly supervise the Defendant Officers in the law and permitted practices and procedures surrounding the stopping of motorists, the issuance of traffic citations, warnings, and Safety Equipment Repair Orders, and the proper investigation of possible criminal activity, thereby causing the violations of the Plaintiffs' constitutional rights.

181.     Montgomery County, Maryland also failed to properly train, or insufficiently trained, its officers in the law and permitted practices and procedures surrounding the stopping of motorists, the issuance of traffic citations, warnings, and Safety Equipment Repair Orders, and the proper investigation of possible criminal activity, thereby causing the violations of the Plaintiffs' constitutional rights.  This failure to train evinces Montgomery County, Maryland's deliberate indifference to the constitutional rights of its citizens, whom it knows will come into contact with its police department.

182.     The misconduct and constitutional violations committed by the individual Defendants in the course of the stop, detention, arrest, and search of the Plaintiffs were carried out pursuant to these policies, customs, patterns, and practices of investigative misconduct, and were directly and proximately caused by Montgomery County, Maryland's failure to train and supervise its officers and its condonation of widespread practices taking place in the MCPD.

183.     As a direct result of these policies, customs, patterns, and practices, the Plaintiffs were wrongfully detained, arrested, and searched.  They also suffered the other grievous injuries and damages set forth herein.

**Count VII**

**Plaintiffs' Equal Protection Claims Under the
Fourteenth Amendments of the U.S. Constitution
(Against Defendant Montgomery County, Maryland)**

184.     Plaintiffs hereby incorporate by reference paragraphs 1 through 183 and further allege as follows:

185.     At all times relevant hereto, Plaintiffs had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to equal protection under the law.

186.     On May 2, 2016, MCPD violated Plaintiffs' rights to equal protection when an MCPD officer initiated a traffic stop based on Plaintiffs' race as African-Americans.

187.     MCPD violated Plaintiff's rights to equal protection when its officers unlawfully detained Plaintiffs longer than necessary to effectuate any valid law enforcement purpose, by unlawfully searching their persons and property, and by unlawfully arresting them, all based on their race as African-Americans.

188.     MCPD has evidenced clear discriminatory intent through, *inter alia*, its officers' pattern of traffic stops, detentions, searches, and arrests, their racial prejudiced assumptions about motorists of color, and their failure to comply with clearly established law which prevents using race as a factor in policing.

189.     MCPD has maintained a pattern and practice of stopping, detaining, searching, and arresting black and brown motorists at a rate starkly disproportionate to their proportion of the Montgomery County population.

### Count VIII

### Plaintiffs' Equal Protection Claims Under the Fourteenth Amendments of the U.S. Constitution (Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendants in their Individual Capacities))

190.     Plaintiffs hereby incorporate by reference paragraphs 1 through 189 and further allege as follows:

191.     At all times relevant hereto, Plaintiffs had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to equal protection under the law.

192.     On May 2, 2016, Officer Dyer violated Plaintiffs' rights to equal protection when she initiated a traffic stop based on Plaintiffs' race as African-Americans.

193.     Defendant Officers violated Plaintiff's rights to equal protection by unlawfully detaining them longer than necessary to effectuate any valid law enforcement purpose, by unlawfully searching their persons and property, and by unlawfully arresting them, all based on their race as African-Americans.

194.     Defendant Officers have evidenced clear discriminatory intent through, *inter alia*, their pattern of conduct during the stop, detention, search, and arrest of Plaintiffs, of their racial prejudiced assumptions about motorists of color, and their failure to comply with clearly established law which prevents using race as a factor in policing.

**Count IX**

**Plaintiffs' Claims of False Arrest**
**(Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and Jane Doe Defendants in their Individual Capacities)**

195.     Plaintiffs hereby incorporate by reference paragraphs 1 through 194 and further allege as follows:

196.     Defendant Officers deprived the Plaintiffs of their liberty by restricting their movement by ordering them to sit on the curb and placing them in handcuffs;

197.     The Plaintiffs did not consent in any way to having their freedom of movement restricted;

198.      The Defendant Officers, with malice or gross negligence, deprived the Plaintiffs of their liberty without probable cause to believe that they committed any crime and without any legal justification.

**Count X**

**Plaintiffs' Claims of Assault and Battery**
**(Against Defendants Dyer, Joseph, Wagner, and Giacalone)**

Plaintiffs hereby incorporate by reference paragraphs 1through 198 and further allege as
follows:

199.    Officer Dyer, Officer Joseph, Officer Wagner, and Officer Giacalone, with malice
or gross negligence, attempted to and did place Plaintiffs in handcuffs.

200.    The Plaintiffs did not consent in any way to being handcuffed by Officers Dyer,
Officer Joseph, Officer Wagner, and Officer Giacalone and these officers' physical contact with
Plaintiffs was harmful and offensive to Plaintiffs.  Ms. Faulk-Foster was visibly distraught,
repeatedly said she did not want to be arrested and asked why officers were putting handcuffs on
her.  In addition, when she asked the officers to loosen her handcuffs because they felt too tight,
Officer Joseph told her that the handcuffs were "supposed to be uncomfortable, not
comfortable."  Due to Mr. Miller's previous interactions with the police, he chose to stay silent,
even though he obviously did not consent to being arrested.

201.    Officer Dyer, Officer Joseph, Officer Wagner, and Officer Giacalone handcuffed
the Plaintiffs without probable cause to believe they committed any crime and without any legal
justification.

202.    Officers Dyer and Officer Giacalone, with malice or gross negligence, attempted
to and did physically search Plaintiffs' persons.

203.    The Plaintiffs did not consent in any way to being searched by Officer Dyer and
Officer Giacalone, and Officer Dyer's and Officer Giacalone's physical contact with Plaintiffs
was harmful and offensive to Plaintiffs.  Officer Dyer (with respect to Ms. Faulk-Foster) and
Officer Giacalone (with respect to Mr. Miller) patted down virtually every part of the Plaintiffs'

bodies over their clothes, including Ms. Faulk-Foster's hair, Ms. Faulk-Foster's breasts, Miller's chest, Plaintiffs' buttocks, and Plaintiffs' groins, in public and in front of Plaintiffs' family members.

204.    Officer Dyer and Officer Giacalone physically searched the Plaintiffs without probable cause to believe they committed any crime and without any legal justification.

### Count XI

**Plaintiffs' Unlawful Detention Claims for Violations**
**of Articles 24 and Article 26 of the Maryland Declaration of Rights**
**(Against Defendants Dyer, Joseph, Wagner, Gruber, Giacalone, Paul, Reese, and John and**
**Jane Doe Defendants in their Individual Capacities)**

205.    Plaintiffs hereby incorporate by reference paragraphs 1 through 204 and further allege as follows:

206.    At all times relevant hereto, Plaintiffs had clearly established rights under Articles 24 and 26 of the Maryland Declaration of Rights, to be free from unreasonable seizures. Defendant Officers, with malice or gross negligence, detained Plaintiffs in violation of their rights as protected under Articles 24 and 26 of the Maryland Declaration of Rights, including without limitation, the right to be free from unlawful seizure.

207.    Defendant Officers, acting under color of Maryland law, improperly detained Mr. Miller and Ms. Faulk-Foster beyond the time and scope allowable for a *Terry* stop pursuant to Articles 24 and 26 of the Maryland Declaration of Rights, without reasonable articulable suspicion to believe that they had violated the law or were in possession of illegal contraband.

208.    Defendant Officers improperly detained Mr. Miller and Ms. Faulk-Foster well beyond the time necessary to effectuate the purpose of the stop, ostensibly because of equipment violations.  The Defendant Officers' unlawfully detained Mr. Miller and Ms. Faulk-Foster after Mr. Miller demonstrated and the Defendant Officers' confirmed that Mr. Miller was entitled to

operate his vehicle, had a valid driver's license, vehicle registration, and insurance, and had no

outstanding warrants.  The Defendant Officers thereafter engaged in a sustained course of delay

in order to improperly investigate the presence of drugs in Mr. Miller's car without reasonable

articulable suspicion to believe that any drugs were present in his car, and without any other

lawful reason to detain Mr. Miller and Ms. Faulk-Foster.

### Count XII

**Plaintiffs' Unlawful Search Claims for Violations of Articles 24 and Article 26 of the
Maryland Declaration of Rights
(Against Defendants Dyer, Joseph, Wagner, Giacalone, Gruber, and Paul in their
Individual Capacities)**

209.    Plaintiffs hereby incorporate by reference paragraphs 1 to 208 and further allege

as follows:

210.    At all times relevant hereto, Plaintiffs had clearly established rights under Article

24 and 26 of the Maryland Declaration of Rights, to be free from unreasonable searches.

Defendant Officers named in Count XII, with malice or gross negligence, detained Plaintiffs in

violation of their rights as protected under Articles 24 and 26 of the Maryland Declaration of

Rights, including without limitation, the right to be free from unlawful searches.

211.    The officers, acting under color of Maryland law, conducted multiple searches,

each of which the officers performed without probable cause to believe that Mr. Miller and Ms.

Faulk-Foster had committed any crime and without probable cause to believe that they wer ein

possession of any illegal contraband, in violation of their rights under Articles 24 and 26 of the

Maryland Declaration of Rights.

212.    The officers, acting under color of Maryland law, searched the trunk of Mr.

Miller's car without Mr. Miller's knowing and voluntary consent, without probable cause to

believe that the trunk contained any illegal contraband, in violation of Mr. Miller's rights under Articles 24 and 26 of the Maryland Declaration of Rights.

213.    The officers, acting under color of Maryland law, searched Mr. Miller and Ms. Faulk-Foster's persons without probable cause to believe that they possessed any illegal contraband, in violation of their rights under Articles 24 and 26 of the Maryland Declaration of Rights.

214.    The officers, acting under color of Maryland law, searched Mr. Miller's car and Ms. Faulk-Foster's purse without probable cause to believe that they possessed any illegal contraband, in violation of their rights under Articles 24 and 26 of the Maryland Declaration of Rights.

215.    Given the totality of the circumstances and the information known by the officers, no prudent person of caution would reasonably believe that any drugs or other contraband was on the person of Mr. Miller or Ms. Faulk-Foster or were present in Mr. Miller's car or Ms. Faulk-Foster's purse.

### Count XIII

### Plaintiffs' Unlawful Arrest Claims and Deprivation of Liberty
### Under Articles 24 and 26 of the Maryland Declaration of Rights
### (Against Defendants Dyer, Joseph, Wagner, Giacalone, Gruber, Paul, Reese, and John and Jane Doe Defendants in their Individual Capacities)

216.    Plaintiffs hereby incorporate by reference paragraphs 1 to 215 and further allege as follows:

217.    At all times relevant hereto, Plaintiffs had clearly established rights under Articles 24 and 26 of the Maryland Declaration of Rights, to be free from unreasonable seizures. Defendant Officers, with malice or gross negligence, detained Plaintiffs in violation of their

rights as protected under Articles 24 and 26 of the Maryland Declaration of Rights, including without limitation, the right to be free from unlawful seizures.

218.    Defendant Officers, acting under color of Maryland law, arrested Mr. Miller and Ms. Faulk-Foster, without probable cause to believe that they had committed any crime, in violation of their rights under Articles 24 and 26 of the Maryland Declaration of Rights. Defendant Officers, acting under color of Maryland law, handcuffed Mr. Miller and Ms. Faulk-Foster without probable cause to believe that had committed any crime, in violation of their rights under Articles 24 and 26 of the Maryland Declaration of Rights.

219.    Given the totality of the circumstances and the information known by the Defendant Officers, no prudent person of caution would reasonably believe that Mr. Miller or Ms. Faulk-Foster had committed any crime at the time the Defendant Officers arrested them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sharon Faulk-Foster and Vincent Miller pray for judgment as follows:

a.    An award of compensatory damages against Defendant Officers in an amount to be determined at trial;

b.    An award of punitive damages against Defendants Officers in an amount to be determined at trial;

c.    An award of Plaintiffs' costs and reasonable attorneys' fees in this action pursuant to 42 U.S.C. §§ 1983 and 1988;

d.    Appropriate injunctive relief, including the implementation of training protocols to prevent and effectively discipline the conduct complained of herein; and

e.    An order granting such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs request trial by jury as to all issues in this case.

Respectfully submitted:


Jonathan Smith*
Emily Gunston*
Dennis Corkery (Bar No. 19076)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
11 Dupont Circle NW, Suite 400
Washington, DC  20036
(202) 319-1000
jonathan_smith@washlaw.org

*Counsel for Sharon Faulk-Foster and Vincent Lamont Miller*


Deborah A. Jeon (Bar No.06905)
Sonia Kumar (Bar No. 07196)
ACLU of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, Maryland  21211
(410) 889-8550 x. 103
kumar@aclu-md.org

*Counsel for Sharon Faulk-Foster and Vincent Lamont Miller*

*\*Pro Hac Vice Application Pending*

Stephen J. Harburg*
/s/ Donald P. Salzman (Bar No. 16501)
Andrew Hanson*
Allen Davis*
Jessica R. Watters*
Todd D. Kelly*
Michael Clegg*
Kent T. Hiebel*
1440 New York Avenue NW
Washington, DC 20005
(202) 371-7000
donald.salzman@probonolaw.com

*Counsel for Sharon Faulk-Foster and Vincent Lamont Miller*